Harry A. Bigelow, Trustee in Bankruptcy of Insull Utility Investments, Inc., Appellant, v. Frank H. Bicek, Appellee.

Gen. No. 40,219.

Opinion filed December 21, 1938. Rehearing denied January 16, 1939.

ROSENTHAL, HAMILL, ELDRIDGE & KING, of Chicago, for appellant; WILLARD L. KING and NEWELL A. CLAPP, of Chicago, of counsel.

EDWARD G. BICEK, of Chicago, for appellee.

MR. JUSTICE O'CONNOR delivered the opinion of the court.

May 29, 1937, plaintiff brought an action against defendant to recover $770 with interest thereon at the rate of 5 per cent per annum from June 15, 1931. Defendant's motion to strike the complaint was sustained, plaintiff elected to stand by his complaint, the suit was dismissed at his costs, and he appeals.

The complaint alleged that the Insull Utility Investments, Inc., was adjudged a bankrupt in the District Court of the United States for the Northern District of Illinois, Eastern Division, on September 22, 1932, and that plaintiff was appointed and is now acting as trustee of the estate; that among the assets of the bankrupt estate were certain "written contracts, known as subscription warrants" signed by defendant, whereby he subscribed for 22 shares of the common stock of the Investment company; that this stock was being issued pursuant to a resolution of the Board of Directors and subscription warrants which, as exhibits, were made a part of the complaint; that defendant agreed to pay $1,100 for the 22 shares in 10 instalments of $110, beginning September, 1930, and ending with June, 1931; that defendant paid three instalments— September 12, October 8 and November 25, 1930,— leaving a balance due of $770, with interest at 5 per cent from June 15, 1931, which defendant refuses to pay. It was further alleged that if the assets of the estate of the bankrupt were collected in full, including all unpaid subscriptions for the stock, they would be insufficient to pay all valid claims filed against the estate, and that the "Insull Utility Investments, Inc., has performed all the conditions of said contracts, on its part to be performed."

The resolution of the Board of Directors of the Investments company passed July 28, 1930, provided that each holder of common stock, as shown of record on the company's books at noon on Saturday, August 30, 1930, should "be entitled to subscribe for new

or additional Common Stock" to 20 per cent of their respective holdings at $50 per share, payable at the election of the stockholder in one payment on or before September 15, 1930, or in 10 instalments of $5 each on or before the 15th of September, 1930, and each month thereafter, ending with the month of June, 1931; that a "subscription warrant" be mailed to each stockholder. The resolution further provided that upon making the payment of the whole or one or more instalments, the subscriber would be entitled to receive "a Stock Subscription Receipt" upon which payments of the instalments were to be indorsed as made. "On the date of final payment of the subscription price within the time hereinabove prescribed the recorded subscriber shall be entitled to have issued to him" a certificate or certificates of stock for the number of shares. That the certificate should not be delivered except upon surrender of the receipt, and "ownership of a Stock Subscription Receipt shall not constitute the owner a stockholder in the company, nor give him any voting or dividend rights. The rights of any recorded subscriber or of the holder of any Stock Subscription Receipt may be forfeited in accordance with the Company's by-laws for default in payment of any instalment when due"; that when the recorded subscriber receives his certificates "he shall receive also interest at the rate of four per centum (4%) per annum upon each instalment paid calculated from the date of payment to the Common Stock dividend record date last preceding the date upon which he becomes entitled to such certificate . . . ; provided, however, that forfeiture of a subscription . . . for default in payment of any instalment when due shall terminate all right to any interest."

The "Subscription Warrant" attached to the complaint certifies that the stockholder upon surrender of the warrant, is entitled to subscribe for shares of the

common stock of the Investments company at $50 a
share, in accordance with the resolution of the Board
of Directors of July 28, 1930, paying for such stock in
1 or 10 instalments of $5 each, beginning September 15,
1930, and ending June, 1931. The warrants bore an
indorsement dated September 12, 1930, addressed to
the Investments company, entitled "Subscription."
These were signed by defendant, Bicek, and stated
that he had elected to pay his "subscription on the 10
payment plan."

Defendant's written motion to strike specified as
reasons, (1) there was no allegation in the complaint
of a tender or a readiness to tender the stock; (2) that
since the Investments company was a bankrupt, neither
it nor plaintiff was able to perform the agreement set
out in the complaint and exhibits; and (3) there was
no allegation that the Investments company had com-
plied with the provisions of the Illinois Securities law.

Plaintiff contends that "the contracts sued on are
contracts of subscription for shares of stock in a cor-
poration" and that "it is not necessary to deliver or
tender the stock subscribed for, or allege or prove the
readiness or ability to do so." In support of these
contentions counsel cite *Smith v. General Motors Corp.*,
289 Fed. 205; *Wemple v. St. Louis, Jerseyville &
Springfield Ry. Co.*, 120 Ill. 196; *In re Hannevig*, 10
F. (2d) 941; *Martin v. Clarke*, 95 F. (2d) 26; *Shiffer v.
Akenbrook*, 75 Ind. App. 149, and other authorities.

In the *Smith* case (289 Fed. 205) the General Motors
Corporation increased its common stock and offered to
its existing common stockholders proportionately the
right to subscribe to new stock at $20 a share. Smith
subscribed for several thousand shares and made a
down payment of $2 a share. Before the balance be-
came due he died and his administrators refused to
pay. Suit was brought against them, there was a di-
rected verdict for plaintiff and the case was taken to

the court of appeals where the judgment was affirmed. In its opinion the court said, ''Was it a subscription or purchase contract, rather than an option to subscribe?'' It was held to be a subscription contract, and continuing the court said that on the day when the $18 per share was due the stock had a market value of more than $18 per share, and that if the contract was to be treated as one of purchase and sale the vendor was under the usual duty to mitigate damages by selling at the market price, in which case there would be no damage.

In that case the General Motors was a going concern, was able and willing to deliver the stock and had tendered certificates for the shares to the administrators of the estate of the purchaser which upon refusal were deposited with the clerk of the court. Obviously that case is not in point with the case before us, where the Investments company is in bankruptcy and utterly disabled from delivering the certificates for the shares of stock.

In the *Wemple* case (120 Ill. 196) the defendants gave a conditional note for $500 to a railroad company for which they were to receive five shares of stock when the railroad was constructed along a certain route, etc. The jury found the railroad was so constructed. The court in construing the note held that the certificate should be issued ''after payment is made.'' In that case there was no inability on the part of the railroad company to deliver the certificate for the shares.

In *In re Hannevig,* 10 F. (2d) 941, it appeared that a claim was allowed against the bankrupt estate of Hannevig. The claim was ''alleged to be due from the bankrupt on unpaid subscriptions on account of the purchase of shares of stock'' in a foreign bank, which at the time the claim was filed was in process of liquidation. But one witness testified that, ''The claim is based on calls and assessments on stock'' of the bank;

that 20,000 shares had been alloted to Hannevig. By
the original subscription agreement, Hannevig re-
quested the bank to allot to him a certain number of
shares or any less number that might be alloted to him,
"and I authorize you to register me as a holder of the
shares." The court held that they would not take
judicial notice of the laws of a foreign country, and
that, "In the United States a subscription for stock
implies a promise to pay for it, even though the sub-
scription was before incorporation. . . . the record
shows to our satisfaction that an allotment of this
stock to the bankrupt was actually made"; but that
whether the allotment had been made was not of im-
portance; that the law in this country was well settled
and that it was no defense to an action on a subscrip-
tion to say that a corporation had not delivered or
tendered the certificate of stock. And said that the
bankrupt, when a call was made upon him for payment
of one pound per share, acknowledged his liability.
In concluding the opinion the court said (p. 947): "In
view of the whole record and of the fact that at the
present time the name of the bankrupt appears on the
official records of the bank as the owner of the 20,000
shares of stock [the number of shares he subscribed
for] and that fact is known to him, and he has done
nothing to have his name removed from the list, we
are unable to say, upon the record as it is presented,
that the bankrupt has rebutted and overcome the *prima
facie* case made by the filing of the proof of claim."

In the *Martin* case (95 F. (2d) 26) the claim of the
trustee of a bankrupt company was allowed against
Clarke and on appeal the judgment was affirmed. The
basis of the claim was the failure of the defendant to
pay the balance due for stock in the bankrupt company
subscribed by him. The decision was based on the
statute of Delaware. Prior to the bankruptcy pro-
ceeding Clarke had paid more than ⅔ of the purchase

price of the stock. He had subscribed for 940 shares each of the preferred and common stock. Under the subscription agreement one-half of the subscription was to be paid in cash and the balance from time to time as called for by the board of directors. "Certificates for said shares shall be issued as the same are paid for hereunder." The court said the trustee had secured the entry of an assessment upon showing the insolvency of the corporation. The court there considered the question of jurisdiction and based its decision on the laws of Delaware and said (p. 28): "But it is said that defendant did not receive all the certificates and that the same have not been tendered him. . . . the liability of the subscriber, though based upon contract, is a statutory one for the benefit of the creditors, and where insolvency or bankruptcy intervenes the futility of issuance of the proper certificates avoids any necessity of delivery or tender thereof."

In the *Shiffer* case (75 Ind. App. 149) a trustee of an Indiana bankrupt corporation brought an action against the subscribers to its capital stock to recover unpaid balances on their several subscriptions. A demurrer was sustained to certain parts of the complaint, plaintiff refused to plead further, judgment was rendered against him and he appealed. The court then analyzes the complaint and says that it charged the subscriptions were taken before the incorporation; that after the incorporation the directors of the company accepted the subscription contracts; that thereafter the defendants accepted the rights and privileges of stockholders and promised to pay their subscription and did pay the first call on the subscription made by the directors, "so that they became entitled to all the rights and privileges of stockholders of the corporation and assumed all the liabilities of subscribers . . . participated in the affairs of the corporation, attended meeting of its stockholders and voted thereat for the

election of directors and the adoption of by-laws and by their acts . . . proclaimed to the public and to persons dealing with the corporation and selling it goods and extending it credits, that they were stockholders . . . that they held out to the public and to persons dealing with such corporation and giving it and extending credit to it, that their subscriptions were *bona fide* subscriptions'' until the company went into bankruptcy; and it was held that defendants were liable on their subscription contracts although no certificate of stock had been issued or tendered.

In the instant case counsel for defendant contends that the contract entered into by defendant for the 22 shares of stock, construed most favorably to plaintiff, ''are not subscriptions for stock but merely executory contracts for the sale and purchase of stock,'' citing *Stern v. Mayer,* 166 Minn. 346, 207 N. W. 737; *Guaranty Mortgage Co. v. Wilcox,* 62 Utah 184, 218 Pac. 133; *Crichfield-Loeffler, Inc. v. Taverna,* 4 N. J. Misc. 310, 132 Atl. 494; *Boroseptic Chemical Co. v. Nelson,* 53 S. D. 546, 221 N. W. 264; *Barnard v. Tidrick,* 35 S. D. 403, 152 N. W. 690; *Gill Printing Co. v. Goodman,* 224 Ala. 97.

In the *Stern* case defendant Mayer signed a written document, ''Application for Stock. I hereby subscribe for 5 shares of the Common Capital Stock of the U. S. I. Realty Company of Minneapolis, Minnesota, and agree to take the same when issued and to pay for the same $800.'' The payments were $72 annually and the document further provided, ''The company accepts the subscription and agrees to issue and deliver the stock when the amount paid with interest thereon at 6% per annum . . . shall equal the subscription price of the stock.'' Afterward the Realty company was adjudged a bankrupt and the plaintiff was appointed trustee. A demurrer was sustained to the complaint, the trustee appealed; the judgment was affirmed. The

court said (p. 348): "The important question is whether this writing is to be construed as a subscription to capital stock or a contract for the sale and purchase of shares of such stock. . . . (p. 349.) If the instrument is a mere subscription for stock like that involved in *Marson v. Deither,* 49 Minn., 423, 52 N. W. 38, the subscriber has the status of a stockholder. In an action upon a stock subscription, which does not by its terms require the execution and delivery of the certificate before or concurrently with payment, an allegation of non-delivery of stock is no defense. In such cases it is not necessary to allege tender thereof in the complaint. . . .

"The general rule is that the execution and delivery of the certificate are not conditions precedent to the liability of a subscriber . . . unless the contract of subscription expressly requires a tender of certificate as a condition precedent to liability thereon. In this case the corporation has agreed to issue and deliver the stock when its purchase price is paid. It may, notwithstanding this reservation, be a subscription. The presence of such reservation is a circumstance indicative of a sale rather than a subscription. Whichever it may be, the complainant must plead that it is able and willing to perform. In other words, where the contract in a stock subscription provides for delivery of stock when paid for, the acts must be regarded as contemporaneous. In such case the corporation's inability to perform should disable it from enforcement against the subscriber, although he may, by virtue of the terms of his contract, be a stockholder. Hence in an action for the whole amount subscribed or to enforce payment of the final instalment, plaintiff must allege his willingness and ability to perform. . . . (p. 350.) The distinction between the sale of corporate stock and subscription thereto is that a subscriber has certain attributes in the way of rights, privileges

and liabilities, ordinarily including title, that do not attach to a purchaser. Plaintiff asks to have this instrument construed as a subscription with the attributes mentioned withheld from the defendant or suspended until he makes payment. The absence of such rights and liabilities is the very thing that prevents holding the instrument to be a subscription. If these attributes are to attach only on complete performance by defendant, the transaction is ordinarily a sale. The subscriber, by the terms of his contract, becomes the owner of the stock before the certificate is issued or delivered.''

The court held that the agreement was not a subscription but an executory contract for the sale and purchase of stock, and said that plaintiff had alleged he was ready and willing to deliver the certificate but the complaint disclosed that the corporation was bankrupt and that (p. 352) ''Ordinarily bankruptcy is a complete disablement of the bankrupt from performance of his contracts and the equivalent of a repudiation, subject only to the right of the trustee in some cases to rehabilitate the contract by performance.'' But held that the corporation for all purposes was lifeless and consequently there could be no performance.

We agree with the reasoning in the *Stern* case, and we think it applicable to the facts in the case before us. In the instant case defendant was to pay for the stock in 10 instalments and upon the final payment he was entitled to have ''issued to him a certificate or certificates'' for the number of shares of stock. Documents signed by defendant for the 22 shares provided the issuance to him of the ''Stock Subscription Receipt shall not constitute the owner a stockholder of the company.'' We hold, as did the Minnesota court, that the agreement or document signed by defendant ''was not a subscription but an executory contract for the sale and purchase of stock.'' While there may be cases where a recovery can be had by the trustee in

bankruptcy against one who has subscribed for shares where the stock of the corporation has been increased without the delivery of the stock certificate or ability to do so, such as where it appears that persons have extended credit to the corporation on the strength of such subscriptions, as in the *Shiffer* case (75 Ind. App. 149), there are no such allegations in the complaint before us.

We think there is no merit in defendant's contention that the contract for the purchase or sale of the stock involved was in violation of the Illinois Securities Law and therefore void. This was an affirmative defense. Obviously the presumption is that the Insull Utility Investments Company complied with the law, and the contrary has not been made to appear.

For the reasons stated the decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*

McSURELY, P. J., and MATCHETT, J., concur.