**BRIDGEPORT HYDRAULIC CO.**

v.

**KRAEMER et al.**

Civ. No. 3936.

United States District Court,
D. Connecticut.

Dec. 10, 1953.

Marsh, Day & Calhoun, Philo C. Calhoun, Bridgeport, Conn., Satterlee, Browe & Mathews, New York City, Rollin Brown and Milton D. Solomon, New York City, for plaintiff.

Adrian W. Maher, U. S. Atty., New Haven, Conn., and Leland T. Atherton, Sp. Asst. to Atty. Gen., for defendants.

HINCKS, Circuit Judge.

This is an action to recover excess profits taxes allegedly overpaid for the years 1941–1943 to the defendants who were successively Collectors of Internal Revenue. Most of the underlying facts were proved by a voluminous stipulation. The plaintiff's brief contains a remarkably lucid summary of the operative facts which in large part I adopt as my

Finding of Facts.

1. Throughout the period here relevant the plaintiff, a Connecticut corporation, computed its excess profits credit on the average base-period earnings basis. Its first taxable year under the excess profits tax law was the calendar year 1940.

2. On January 15, 1940, the plaintiff issued 25,000 shares of stock of the aggregate par value of $500,000, for a total consideration of $651,284.32, of which $500,000 was added to its Capital Stock Account and $151,284.32 was added to an account called Premium on Capital Stock.

3. On its tax returns for 1941–3 the plaintiff claimed the amount of $651,-284.32 as a capital addition, but the Commissioner of Internal Revenue allowed only $150,264.32, disallowing the balance of $501,020 on the ground that money to that amount, although not required to be paid until January 8, 1940, had been received by the plaintiff late in December, 1939 and therefore was not "money paid in for stock" in 1940.

Facts Relating to the Offering,
Subscription and Issuance
of the New Shares.

4. The issuance of the 25,000 shares was authorized by resolutions adopted by the stockholders and directors in June, 1939 (Ex. A–1, 2), subject to approval of the Connecticut Public Utilities Commission and the Securities and Exchange Commission. The details of the issue were left to the Executive Committee which adopted resolutions in October, 1939 (Ex. A–7) directing that the new stock be offered to existing stockholders of record on December 1, 1939, on warrants to be exercised by them on or before January 2, 1940, the subscriptions to be paid on or before January 8, 1940, the stock to be issued on January 15, 1940, or as soon thereafter as possible, and "said shares to be entitled to participate in any dividend declared by this Company after January 15, 1940." On October 3, 1939, the Public Utilities Commission approved the proposed issue at the selling price of $26 per share (Ex. A–6), on the plaintiff's application which had been filed September 16, 1939 (Ex. A–5).

5. The Registration Statement filed with the Securities and Exchange Commission (Ex. A–8) stated that the new stock was to be issued on January 15, 1940, or as soon thereafter as possible and that "the holders of such stock will be entitled to share in any dividends declared by the Company after January 15, 1940 but will have no rights as stockholders until after such date." The Prospectus filed with the Securities and Exchange Commission (Ex. A–9) stated that the new stock certificates would be issued on or about January 15, 1940, and that "such stock will entitle its holders to share in any dividends declared by Registrant after January 15, 1940, but

to no rights to dividends or other rights of stockholders until after said date." The Prospectus also stated that any stock not subscribed for by stockholders, and any stock subscribed for but not paid for, would be sold in such manner as the Executive Committee should determine, but at not less than $26 per share without the prior approval of the Public Utilities Commission.

6. On December 5, 1939, a letter (Ex. A–10) was sent to the stockholders, informing them of their rights to subscribe to the new stock and enclosing warrants evidencing such rights, and on the same day copies of the Prospectus were sent to the stockholders (Ex. A, paragraph VII). The letter addressed to the stockholders referred to the Prospectus as "describing" the proposed stock issue. By inference from the proof of mailing, I find that the letter was received by the stockholders.

7. Warrants covering 19,270 shares were received from subscribing stockholders during December, 1939, together with remittances for the subscription price of such shares, aggregating $501,-020. During the period January 1–8, 1940, remittances aggregating $145,730 were received on additional warrants covering 5,605 shares (Ex. A, paragraph VIII). On January 6–10, 1940, the plaintiff agreed to issue to others the 125 shares which had not been subscribed for, for the sum of $4,534.32 (id.). Thus the entire issue of 25,000 shares was sold for the aggregate sum of $651,284.32.

8. The new stock certificates were dated January 15, 1940, and were issued to the purchasers on or after that date.

### Facts as to the Handling of the Subscription Receipts.

9. As the remittances accompanying the subscriptions (and the money paid for the 125 shares sold to others) were received, they were deposited in a Special Stock Issue Account which was opened at the First National Bank and Trust Company of Bridgeport for that purpose on December 8, 1939. The re-mittances aggregating $501,020 which, as stated in finding 7, were received by the plaintiff in December 1939 were all deposited in that account. (Ex. A, Paragraph IX; Ex. A–13–14).

10. On January 8, 1940, the day on which the subscription period ended, the plaintiff transferred $360,000 of the subscription receipts from the Special Stock Issue Account to four other "Special Inactive" bank accounts which it maintained as accommodation accounts with banks from which it was accustomed to borrowing from time to time and with which it therefore wished to maintain banking relations, and which accounts were not used as regular disbursing or checking accounts. (Ex. A, paragraph IX; Exs. A–15(a), 15(b), 15 (c), 15(d) and 15(e) and 16).

11. On January 11, 1940, after the entire new issue had been subscribed and paid for, the plaintiff drew $100,000 out of the Special Stock Issue Account, to pay temporary bank loans it had negotiated in anticipation of the stock financing (Ex. A, paragraph IX).

12. On January 12, 1940, the plaintiff transferred the remaining balance in the Special Stock Issue Account to its regular disbursing or checking account in the same bank (Ex. A, paragraph IX).

### Facts as to the Covering Book Entries.

13. Prior to December 31, 1939, no entries were made in the plaintiff's books of account to reflect the subscription receipts previously received. On that date, however, a Journal Voucher was prepared (Ex. A–17(e)), directing that the $501,020 which had been received be charged on the Ledger to the Cash Account and be credited on the Ledger to a *Capital Stock Subscription Account* to the extent of $385,400, being the par value of the shares covered by such receipts, and to Premium on Capital Stock to the extent of the balance of $115,620. The direction contained in this voucher was at first, due to a bookkeeping error, incorrectly applied in that said $385,400 was first entered on

the Capital Stock Account (Ex. A–17 (a)) but, that being erroneous and not in compliance with the Journal Voucher, it was immediately stricken out and the amount was entered correctly on a new account which was entitled "Subscriptions To Capital Stock" (Ex. A–17(b)). The correction of the erroneous entry was not made because of intent to evade the statute relating to the taxation of excess profits or any other provisions of the Internal Revenue Acts. The $115,-620 was entered on an account entitled "Premium on Capital Stock Subscribed" (Ex. A–17(c)).

14. On the next business day, January 2, 1940, another Journal Voucher (Ex. A–17(f)) was prepared, directing that the entries made on December 31, 1939, be reversed, which was duly done, and that the $385,400 be charged to "Subscriptions To Capital Stock" (Ex. A–17(b), second page) and the $115,620 being charged to "Premium On Capital Stock Subscribed" (Ex. A–17(c), second page).

15. On January 10, 1940, the day on which the last of the 25,000 shares were paid for, new entries were made on the books to reflect the entire transaction. The entire proceeds of $651,284.32 were charged to Cash (Ex. A–15(d), second page); $500,000, the par value of the 25,000 shares, was credited to Capital Stock (Ex. A–17(a), second page), not to "Subscriptions to Capital Stock", as on December 31, 1939; the title of the account "Premium On Capital Stock Subscribed" was changed to "Premium On Capital Stock" and $151,284.32 was credited thereto (Ex. A–17(c), second page).

### Facts as to the Treatment of the Purchasers as Stockholders.

16. On December 19, 1939, the plaintiff's directors declared a dividend of 40 cents a share payable to the stockholders of record on December 30, 1939 (December 31st being Sunday). This dividend was paid on January 15, 1940, on the 325,000 shares of stock for which certificates were then outstanding. The subscribers for the new stock did not participate in that dividend to any extent and there is no evidence that any of them even claimed a right to participate in said dividend.

### Conclusions of Law.

1. This court has jurisdiction over the parties and the subject matter.

2. The status of those subscribing to the stock issue here involved is governed by the law of Connecticut which is the State of the plaintiff's incorporation.

3. Under the law of Connecticut, plaintiff's stockholders who in December, 1939, applied for stock in the stock issue here involved and paid therefor in full, like stockholders who made timely applications and payment in January 1940, acquired stockholder status, as to the new stock applied for, on January 15, 1940, and not earlier.

4. The plaintiff made no dedication of the remittances for the new stock to its capital fund before January 1940.

5. The remittances for the new stock received by the plaintiff in December, 1939, constituted a "capital addition" comprising "amounts of money * * * paid in for stock * * * after" January 1, 1940.

6. The plaintiff was entitled to include in its excess-profits credit for the taxable years 1941–1943, the remittances for new stock received by it in December, 1939.

7. The Commissioner of Internal Revenue erroneously disallowed so much of the plaintiff's claimed excess-profits credit for the years 1941–1943 as comprised remittances for plaintiff's new stock received by the plaintiff in December, 1939, and erroneously assessed deficiency taxes to cover such disallowances which were erroneously collected successively by the defendants.

8. The plaintiff is entitled to recover of the defendants the deficiency taxes assessed against it as aforesaid which it has heretofore paid to the defendants, together with interest as provided by law.

The plaintiff may submit for entry a judgment in accordance with the foregoing, on notice unless the defendants, being satisfied that the proposed judgment conforms to the rulings above noted, waive notice.

### Opinion.

The plaintiff contends that in computing its excess profits credit for the taxable years 1941–1943 it was entitled to a credit of $501,020 which was disallowed by the commissioner. The plaintiff's contention is valid if, as the plaintiff contends, within the meaning of Section 713(g) (3) of the Internal Revenue Code, 54 Stat. 981 as amended, 55 Stat. 21, 26 U.S.C.A., the remittances from subscribing stockholders aggregating $501,020, received by the plaintiff during December, 1939, as stated in finding 7, under all the facts found may be deemed to have constituted a "capital addition" comprising "amounts of money * * * paid in for stock * * * after" January 1, 1940 which date was "the beginning of the taxpayer's first taxable year under" the excess profits law. Plaintiff is not entitled to the credit if, as the defendants contend, said $501,020 on all the facts constitutes a "capital addition" comprising "amounts of money * * * paid in for stock" in December, 1939, within the meaning of Section 713(g) (3).

At first glance it would appear that the decisive issue between the parties was one of the proper construction of the federal statute cited, viz., do the statutory words "capital addition" comprising "amounts of money * * * paid in for stock" after January 1, 1940, include, as plaintiff contends, a capital addition comprising money received in 1939 by the taxpayer before its first excess profits year for stock neither issued nor issuable until after the beginning of that year (1940) and not assigned to capital use or used as capital until after the beginning of that year? But careful study of defendants' brief shows that they do not tender that issue of law: in fact they expressly disclaim quarrel with that statutory construction advanced by the plaintiff. Instead, they rest their defense upon another proposition of law, contending that on the underlying facts here—as to which there is no vital dispute—stockholders subscribing for the new stock acquired the status of stockholders, as to the new stock for which they subscribed, when their remittances were received by the plaintiff in December, 1939, so that, in law, the capital addition was completed in 1939.

Such being the defendants' position, there is no occasion to discuss the construction of Section 713 advanced by the plaintiff. I will, however, observe that I am fully satisfied that the plaintiff's interpretation of the *federal statute*, in this respect, is correct. And so, without discussion of that proposition, I turn to examine the position upon which the defendants rest.

■ The essence of the defense lies in the applicable substantive law relating to the rights and obligation of stockholders. The defendants claim, as applicable, the rule that immediately upon acceptance of a subscription to stock which is immediately issuable, the subscriber acquires the status of a stockholder irrespective of when the certificates are issued, or even if certificates are never issued. This rule is reflected in Conn.Gen.Stats.1949, § 5169, which defendants particularly invoke. In so far as applicable, it reads:

"Sec. 5169. Receipt for payment of subscription; payment in property; directors' liability. No corporation shall issue any certificate for stock until the stock has been subscribed and paid for in full. The treasurer of such corporation shall issue and deliver to each subscriber a receipt, countersigned by the secretary and under the corporate seal, stating the amount such subscriber has paid on his subscription and the number of shares of full-paid and non-assessable stock for which he or his transferee, upon the payment of the balance due upon his said subscription, will be en-

titled to receive a certificate. The treasurer shall enter upon such receipt the dates and amounts of all subsequent payments. *The persons to whom such receipts shall have been issued shall be deemed to be stockholders."* (Emphasis supplied for purposes of subsequent discussion in this opinion.)

But the general rule and the statute cited both presuppose the existence of stock presently issuable and are applicable only to such cases. As to such subject matter, the law, whether by rule or statute, presumes—wholly consistent with the fact—that the parties to a subscription contract mutually intend by their contract forthwith to vest the subscriber with the status of stockholder and all the rights and obligations thereunto appertaining. But there is no rule of law and no Connecticut statute which forbids contracts to acquire in the future a stockholder status as to stock not yet issuable and hence not yet in existence. A stock subscription contract like any other contract is what the parties intend it to be, their intent being expressed in words, or lacking unambiguous words, by conduct. The subscriptions here involved expressly referred to the warrant which in turn referred to the stockholders resolution of June 9th, 1939 which, *inter alia*, delegated to the Board of Directors power to "issue said stock * * at such time and manner as it shall deem for the best interests of the Company", pursuant to which, the Board passed its resolution also of June 9th delegating power to its Executive Committee to determine the date on which the new certificates should be issued: and the Executive Committee on October 10, 1939, resolved that payment for the new shares should be completed by January 8, 1940; that the new certificates should issue on January 15, 1940; and that the shares thus issued should "be entitled to participate in any dividend declared by this Company after January 15, 1940". This alone amply warrants the finding that the transactions here involved were executory contracts to be performed on the part of subscribers on or before January 8, 1940 and on the part of the plaintiff by the grant on January 15, 1940 of a stockholder interest to be evidenced by the delivery then of stockholder certificates. Such a finding is further corroborated by the facts set forth in Findings 5 and 6. There cannot be the shadow of a doubt that the contract was such that, as to the new stock, subscribers did not become stockholders until January 15, 1940; both the subscribers and the corporation so intended. If there were any ambiguity in the writings pertaining to the contract,—and I see none —the intent of the parties was ascertainable from their conduct. Finding 16.

Surely there is nothing in the non-statutory law of Connecticut to preclude such a contract from having its intended effect. Such contracts in other jurisdictions are recognized as valid. Smith v. General Motors Corp., 6 Cir., 289 F. 205; Bigelow v. Bicek, 298 Ill. App. 73, 18 N.E.2d 398. Indeed, these cases go so far as to hold that even with respect to stock presently issuable a subscriber may contract for a stockholder interest not attaching until a future date. A *fortiori*, with respect to stock not issuable until a future date subscribers may so contract. And in Connecticut long ago it was recognized that a corporation had power to "prescribe the terms * * * upon which all persons should become members." Hartford & New Haven Railroad Co. v. Kennedy, 12 Conn. 499, 510. My holding is supported by Webb v. Moeller, 87 Conn. 138, 87 A. 277, which recognizes that there is a "distinction * * * of importance" between a contract to subscribe in the future and an accepted subscription for stock presently issuable. To be sure, in that opinion it was said by way of dictum: "A subscription for an issue of the stock of a corporation already organized when accepted makes the subscriber a stockholder, and liable to calls for the full amount subscribed". But, clearly, the opinion, in speaking of a "subscription" for stock in a corporation already organized, had reference to a contract relating to stock

presently issuable and calling for performance by the corporation immediately upon its acceptance of the subscription. This, I say, is clear because the express holding of the case was to the effect that a contract to subscribe in the future did not create a stockholder status until the contract had been performed. The mere fact that the plaintiff here and its stockholders who applied for new stock may have labelled their transcation as a "subscription" cannot suffice to bring it within the dictum quoted above when their language and conduct unmistakably show that they were contracting for future performance and so come within the holding of the case.

■ I hold further that Section 5169 of the Connecticut General Statutes does not operate to prevent the contracts here involved from having their intended effect. As pointed out in Stamford Trust Co. v. Yale & Towne Mfg. Co., 83 Conn. 43, 50, 75 A. 90, 93, "(i)ts controlling purpose is to prevent the issue of any certificate of stock for shares that have not been fully paid up, * * *." It is not even contended that the plaintiff offended that legislative objective and violated the prohibition contained in the *first sentence* of that statute by issuing certificates for stock not fully paid for. The provision of the last sentence in the extract above quoted that persons "to whom *such receipts* shall have been issued shall be deemed to be stockholders" (emphasis added) refers back to the preceding sentence requiring the corporate treasurer to "enter upon *such* receipt the dates and amounts of all *subsequent payments*" (emphasis added), thus plainly indicating legislative concern for the effect of subscriptions made on a time or installment basis. And the same concern is manifest in the second sentence of the statute requiring the issue of a *treasurer's* receipt to each subscriber "countersigned by the secretary and under the corporate seal, stating the amount * * * paid * * * and the number of shares * * * for which he * * * *upon the payment of the balance due* * * * will be entitled to receive a certificate."

(Emphasis added.) Thus from the internal evidence of the statutory text, it is altogether clear that the statute was also directed to the status of those subscribing on a time or installment basis to stock presently issuable, prescribing, that, in such cases, the stock shall be deemed to have issued when the subscriber obtains a treasurer's receipt for his first installment payment, even though the certificate is withheld, as the statute requires, pending payment in full.

Plainly, the subscriptions here are not within the reach of a statute having such objectives. For, here, the plain terms of the contract with so-called subscribers called for performance on the part of the subscriber by payment in full on or before January 8, 1940, and for the grant of stockholder status on January 15, to be evidenced by the delivery then of certificates for stock not issuable at an earlier date, as distinguished from contracts calling for the immediate grant of a stockholder status as to stock *presently issuable* upon part payment, or payment in full, by the subscriber. Also, the receipts given the subscribers here, instead of meeting the specifications of the statute for a treasurer's receipt, were signed only by a temporary clerk of the corporation without countersignature or seal. And nothing in their content expressed, or imported, an intent at variance with the terms of the contract as found above.

■■ The defendants have sought to magnify out of all proportion the importance of the erroneous bookkeeping entry set forth in Finding 13. As to this, it should not be forgotten that the contract depends upon the intent of the parties and is not necessarily controlled by the means used by the plaintiff, unbeknownst to subscribers, for safeguarding remittances made in advance of the date for corporate performance. Granted a contract made in December, 1939, whereby a subscriber agreed to pay for stock in 1940, no unilateral action by the plaintiff could serve to advance the time of payment to December and thus, without his consent, make him a stockholder as of

December, 1939. And so, even if the plaintiff on December 31, 1939, with considered intent, instead of by error immediately corrected, had on its books charged the remittances received in December, 1939, to its capital stock account, the effect would not be so to change the contract as to make the subscribers stockholders in December, 1939. At most, such an entry would be evidential of corporate intent, rightful or otherwise, then to dedicate the remittances theretofore received to corporate capital. But here such an intent and such a dedication are completely negated by proof that the entry was inadvertent and immediately corrected. These proofs completely satisfied me that the entry on which the defendants count was a bookkeeper's error and that its prompt correction was nothing but the bona fide correction of the error. I find utterly no basis for the defendants' contention that the correction of the entry was merely a sham to lay the basis for the tax credit now sued for. After all, the correction was necessary to conform plaintiff's books with the proved terms of the contract under which the remittances were made. And I cannot assume that plaintiff's management, at the time the correction was made, had sufficient powers of clairvoyance to foresee the complicated provisions of a tax law not proposed or enacted until months later.

The facts found in Findings 10 and 11 are likewise ineffective to prove any change in the contractual intent that subscribers should not acquire the status of stockholders until January 15, 1940. Whether they constitute some evidence of a corporate intent to dedicate the December remittances to capital on January 8, or January 11, 1940, is academic for present purposes. For a dedication to capital in January is not inconsistent with plaintiff's proofs that there was no such dedication in the preceding December.

The defendants have cited a number of cases decided by the Board of Tax Appeals. Of these, it is enough to say that none involved the contentions as to the Connecticut corporation law upon which the defense rests, none involved "subscription" contracts, such as those here involved, calling for postponement of the contemplated stockholder status until future performance on both sides, and in none was it held that a capital addition within the meaning of Section 713 of the Code or of its prototypes in prior Acts, resulted from such acts as the proofs here show to have occurred prior to January, 1940.